# Exhibit D

**PCA Case No. 2012-17**                                    **28 March 2013**

**AN ARBITRATION UNDER CHAPTER 11 OF THE NAFTA
AND THE UNCITRAL ARBITRATION RULES, 1976**

between

**MESA POWER GROUP, LLC**

Claimant

and

**GOVERNMENT OF CANADA**

Respondent

---

**PROCEDURAL ORDER NO. 3**

---

**ARBITRAL TRIBUNAL**

Professor Gabrielle Kaufmann-Kohler (Presiding Arbitrator)

The Honourable Charles N. Brower

Toby Landau, QC

**Secretary of the Tribunal**

Rahul Donde

## I.     PROCEDURAL BACKGROUND

1.     In earlier correspondence with the Tribunal, the Parties advised the Tribunal as to their preferences for the seat of the arbitration. At the procedural hearing conducted on 12 October 2012 ("the Procedural Hearing"), the Claimant informed the Tribunal that it may be necessary to subpoena witnesses and/or to seek the assistance of local courts to secure documents in the hands of third parties in the US, and therefore the Tribunal should select a US seat. By contrast, the Respondent argued in favor of a seat in Canada. As a result, the Tribunal invited the Parties to make further submissions on the seat of the arbitration. In particular, the Parties were requested to address the power to subpoena witnesses under the Federal Arbitration Act ("FAA").

2.     In its letter of 16 October 2012, the Tribunal directed the Parties to make their submissions by 26 October 2012, with the option of filing responses by 2 November 2012. Accordingly, the Parties filed submissions on the legal seat of the arbitration on 26 October 2012 and 2 November 2012. On 27 November 2012, the Claimant provided the Tribunal with a decision of the US Supreme Court in *Nitro-Lift Technologies, LLC v. Eddie Lee Howard et. al.,* which, according to the Claimant, addressed "the interplay between the FAA and state legislation, as well as the general supportive attitude of the US Supreme Court towards arbitration."

3.     In its letters of 5 October 2012, 9 November 2012 and at the Procedural Hearing, the Respondent challenged the admissibility of documents that the Claimant had obtained using 28 USC § 1782 ("Section 1782"). Subsequently, on 9 November 2012 and 27 November 2012, the Respondent presented three requests seeking (i) confirmation that the Tribunal had not ruled on the Respondent's objection; (ii) if the Section 1782 documents were admissible, confirmation that the determination would not apply to any transcripts of witness testimony; and (iii) confirmation that further efforts by the Claimant to obtain evidence using section 1782 should be pursued only under the supervision of the Tribunal. On 26 February 2013, the Respondent reiterated some of these requests, and additionally requested the Tribunal to (i) direct the Claimant to identify any Section 1782 documents which were already in the record; and (ii) strike those documents from the record. The Claimant commented on these requests on 19 November 2012 and 27 February 2013. In its letter of 27 February 2013, the Tribunal informed the Parties that it would deal with the Respondent's requests (collectively "the Section 1782 Requests") together.

4.     On 3 December 2012, in accordance with the calendar for the arbitration set forth in Annex B to Procedural Order No. 1 dated 21 November 2012 ("PO 1"), the Respondent submitted its Objection to Jurisdiction as well as its Application for

Bifurcation. On 24 December 2012, the Claimant submitted its Answer to the Request for Bifurcation.

5.   On 18 January 2013, the Tribunal issued Procedural Order No. 2 ("PO 2") containing its decision on bifurcation. For the reasons specified in PO 2, the Tribunal bifurcated the proceedings between "(i) the jurisdictional objection based on the alleged failure of the Claimant to comply with Article 1120(1) of the NAFTA, and (ii) the merits of the case and any and all other jurisdictional objections that may arise." The Tribunal expressly reserved its power to re-join the Article 1120(1) objection to the merits of the case following receipt of the subsequent pleadings by the Parties. Finally, the Parties were directed to follow the procedural calendar set forth in Annex B to PO 1 that assumed bifurcation.

6.   On 19 February 2013, the Claimant submitted its "Answer on Canada's Preliminary Objections on Jurisdiction" ("the Claimant's Answer on Jurisdiction"). The Claimant requested the Tribunal to "summarily dismiss Canada's objections, without further submissions or hearing, and re-join any residual or related issues to be determined after a full hearing on the merits of the Investor's claim." Certain pages of Annex A to the Answer were marked "Confidential Information Unauthorized Disclosure Prohibited".

7.   On 23 February 2013, the Claimant informed the Tribunal that it had received an Amended Protective Order from the United States District Court for the Southern District of Florida in respect of documents produced by NextEra in the Claimant's Section 1782 application before that court ("the Amended Protective Order"). The Claimant submitted that, in light of the Amended Protective Order, it was in a position to provide several documents that were previously restricted from disclosure. As a result, the Claimant sought leave to file additional documents supporting its arguments set out in its Answer on Jurisdiction.

8.   In its response of 26 February 2013, the Respondent submitted that as long as the Amended Protective Order would not apply to either the Respondent or the Tribunal, the Respondent had no comments. Should this not be the case, the Respondent requested an opportunity to address the Tribunal on the application of the Amended Protective Order in this arbitration.

9.   On 26 February 2013, the Claimant requested an opportunity to address document production issues in respect of the "non-jurisdictionally contentious issues" at the forthcoming telephone conference. It also submitted a public version of its Answer on Jurisdiction, which redacted "the Claimant's confidential information and information related to third parties".

10.  On 27 February 2013, the Respondent submitted to the Tribunal that in its Answer on Jurisdiction, the Claimant had failed to comply with the provisions of

3

the Tribunal's Confidentiality Order of 21 November 2013 ("the Tribunal's Confidentiality Order"). It requested a confirmation of the Confidentiality Order and stated that it would object to the Claimant's designation of some information as confidential.

11.  On the same day of 27 February, the Claimant submitted a new version of the Answer on Jurisdiction, which sought to respond to the criticism raised by Canada earlier on that day.

12.  On 26 and 27 February 2013, the Tribunal conveyed the agenda for the telephone conference of 28 February 2013. The Parties were informed that the Tribunal would hear the Parties' comments on the continuation of bifurcation, as well as their comments on further proceedings whether or not bifurcation was continued. Additionally, if necessary, the Parties would be heard on the Claimant's submissions concerning the NextEra Amended Protective Order. Finally, the Claimant was given an opportunity to address issues concerning document production as contemplated in its letter of 26 February 2013, it being specified that the Respondent's response could follow during the telephone conference or thereafter.

13.  On 28 February 2013, a telephone conference was held between the Tribunal and the Parties. The following persons participated in the conference call on behalf of the Parties:

For the Claimant:

- Mr. Barry Appleton, Partner, Appleton & Associates
- Mr. Kyle Dickson-Smith, Counsel, Appleton & Associates

For the Respondent:

- Shane Spelliscy, Counsel, Trade Law Bureau; and
- Michael Owen, Deputy Director and Counsel, Trade Law Bureau.
- Heather Squires, Counsel, Trade Law Bureau;
- Jennifer Hopkins, Counsel, Trade Law Bureau;
- Melissa Perrault, Paralegal, Trade Law Bureau;
- Lucas McCall, Trade Policy Officer, Trade Policy Division, DFAIT;
- Karen Slawner, Team Lead, Ontario Ministry of Energy, Renewables and Energy Efficiency Division;
- Dan Shear, Counsel, Ontario Ministry of Energy, Legal Services Branch;

- Michael Solursh, Counsel, Ontario Ministry of Economic Development, Trade and Employment.

14. The items mentioned in the agenda were addressed at the telephone conference. In addition, the Respondent stated that, in light of the Claimant's submission of 27 February 2013, its objection in connection with the Claimant's compliance with the Tribunal's Confidentiality Order was moot. In this respect, the Tribunal confirmed that, in accordance with paragraph 7 of the Tribunal's Confidentiality Order, the Respondent was free to challenge the Claimant's designation of information as confidential.

15. The Tribunal informed the Parties that the decisions of the Tribunal on the various outstanding issues would be reflected in a procedural order.

16. On 28 February 2013, pursuant to a discussion during the telephone conference, the Claimant submitted a copy of the "Stipulation and Order" issued by the United States District Court for the District of New Jersey in respect of documents produced by Samsung C&T America in the Claimant's Section 1782 application before that court. According to the Claimant, such order adopted the Tribunal's Confidentiality Order. In addition, on 4 March 2013, the Claimant conveyed a submission filed by NextEra in the United States District Court for the Southern District of Florida.

17. On the procedural background recited above, the following issues must be decided in this order: the seat of the arbitration (II); the Section 1782 Requests (III); and the continuation of the bifurcation (IV).

## II.   SEAT OF THE ARBITRATION

### 1.   The Claimant's Position

18. In its letter of 21 September 2012, the Claimant submitted that the appropriate seat of the arbitration should be in the United States, specifically New York or Washington D.C. At the Procedural Hearing, the Claimant indicated a preference for New York. However, in the letters of 26 October 2012 and 2 November 2012, the Claimant proposed either Miami or New York, or "some other convenient location in the United States such as Washington, D.C., San Francisco or Los Angeles."

19. Relying on the UNCITRAL Notes on Organizing Arbitral Proceedings, 1996 ("the UNCITRAL Notes"), the Claimant argues in favor of a legal seat in the US essentially on the basis of the following five factors: (i) proximity to the evidence; (ii) suitability of the procedural law governing the arbitration and court assistance

to the arbitral process, (iii) convenience to the Parties and the Tribunal, (iv) availability and costs of support services, and (v) equal treatment of the Parties aimed at securing "a neutral procedural environment". It emphasizes, in particular, the first two of these factors.

20. First, the Claimant submits that relevant and material evidence is in the possession or control of the Claimant's competitors in various locations throughout the US. Judicial assistance may be required to obtain this evidence. By contrast, there is no indication that it will be necessary to compel evidence in Canada. Consequently, choosing a US seat would be the "most practical and convenient way" to compel necessary witness testimony and documents. The choice of a seat in the US would not affect the Tribunal's authority to order the parties to produce evidence from persons under their control in Canada.

21. Second, the Claimant submits that the FAA is supportive of NAFTA arbitrations and provides an effective means of securing third-party evidence situated in the US. Section 7 of the FAA gives arbitrators the authority to summon witnesses, including third-party witnesses. If arbitral hearings are held in the jurisdiction where third party evidence is located, US courts may grant their support in obtaining evidence under Section 7. Moreover, US courts have held that the powers under Section 7 of the FAA extend to evidence located outside the district in which a court is located, allowing a tribunal to subpoena evidence situated in other US districts. Further, evidence can be obtained under Section 7 of the FAA in conjunction with evidence obtained under Section 1782 of Title 28 of the United States Code.

22. The Claimant also submits that, if a US seat is chosen, state law implementing the UNCITRAL Model Law will be available to support the arbitration. Florida is an UNCITRAL Model Law jurisdiction. In addition, both California and Texas (where evidence directly relevant to this claim is said to be located) have adopted the UNCITRAL Model Law and are supportive of enforcing subpoenas issued by a court in another UNCITRAL Model Law jurisdiction.

23. The Claimant emphasizes that, as is evident from several recent decisions, the attitude of US courts is much more deferential to arbitration than that of Canadian courts. In particular, the Claimant contrasts the decision of the Supreme Court of Canada in *Seidel v. TELUS Communications*[1] to the approach of the US courts in *AT&T Mobility v. Concepcion*[2] and *KPMG LLP v. Robert Cocchi*.[3] The Claimant points to the courts of the States of New York and Florida as being particularly supportive of international arbitration.

---

[1] *Seidel v. TEL US Communications Inc.*, [2011] 1 S.C.R. 531 ("*Seidel*").
[2] *AT&T Mobility v. Concepcion*, 131 S. Ct. 1740 (2011).
[3] *KPMG LLP v. Robert Cocchi et al.*, 132 S. Ct. 23 (2011).

24.  Third, the Claimant submits that a US seat (particularly Miami or New York) would not only be convenient to both the Tribunal and the Parties, but also satisfy the "availability and costs of support services" factor used in the UNCITRAL Notes. Conversely, if the arbitration is seated in Canada, the arbitrators would be required to remit the Goods and Services Tax, which would unnecessarily increase the cost of the arbitration.

25.  Finally, the Claimant submits that in accordance with Article 1115 of the NAFTA and Article 15 of the UNCITRAL Rules, the choice of the place of arbitration should not compromise the equality between the parties. Tribunals in *UPS* and *Merrill* applied this principle of equality in selecting a seat in the US. Ensuring that the supervising court is not one of the Respondent state will secure a neutral procedural environment. Further, no Party should be prejudiced by the application of the *lex fori,* which may occur if a Canadian seat is chosen.

26.  Relying on case law,[4] the Claimant refutes the Respondent's argument that Section 7 of the FAA is territorially or temporally restricted. Contrary to the Respondent's submission that *Dynegy Midstream Services v. Trammochem*[5] prohibited the Tribunal from holding a hearing in a jurisdiction other than the seat to obtain evidence, the Claimant submits that the court in *Dynegy* observed that the parties could have held hearings in Texas to obtain the assistance of the Texan courts in securing third-party evidence although the seat of the arbitration was New York. Further, the Claimant stresses that several courts have confirmed that under Section 7, a tribunal is not temporally limited; it may hold an evidentiary hearing before the merits phase. In fact, in some cases, a tribunal may even subpoena documents without holding a hearing. Relying on *Alliance Healthcare,*[6] the Claimant argues that "the real question, therefore, is not the law of the place of the arbitration, but the law of the place where the subpoena will be enforced". None of the relevant United States Circuit Courts of Appeals has held that a tribunal cannot hold hearings in a place other than the seat of the arbitration for the purpose of receiving evidence under the FAA.

27.  Finally, the Claimant rejects the Respondent's position that Section 1782 will be unavailable if the Tribunal is seated in the US. The Claimant submits that "[a]s this Tribunal is a foreign and international tribunal, constituted under an international treaty with plurilateral membership, there is no impediment to the Tribunal being able to use Section 1782 if the seat of the arbitration is within the

---

[4] See, for instance, *Festus & Helen Stacy Foundation, Inc. v. Merrill Lynch, Pierce Fenner, & Smith Inc.*, 432 F. Supp. 2d 1375, 1379-1380 (N.D. Ga. 2006) ("*Festus*"); *Life Receivables v. Syndicate* 102 at Lloyd's of London, 549 F.3d 210, 218 (2d Cir. 2008) ("*Life Receivables*").
[5] *Dynegy Midstream Services, LLC v. Trammochem et al.*, 451 F.3d 89, 96 (2d Cir. 2006) ("*Dynegy*").
[6] *Alliance Healthcare Services, Inc. v. Argonaut Private Equity*, LLC et al., 804 F. Supp.2d 808, 813 (N.D. Ill. 2011) ("*Alliance Healthcare*").

US. This Tribunal is an international tribunal and continues in this capacity no matter where its seat is set."

2.   The Respondent's Position

28.   In its letters of 10 September 2012, 26 October 2012 and 2 November 2012, and at the Procedural Hearing, the Respondent submitted that the legal seat should be Toronto or, failing Toronto, Calgary. Upon a question from the Tribunal, the Respondent also considered Montreal as a possible venue.

29.   The Respondent rebuts each of the Claimant's arguments in favor of a seat in the US. In essence, it advocates a seat in Canada on the basis of the same factors relied upon by the Claimant: (i) the proximity to the evidence; (ii) the suitability of the procedural law governing the arbitration and court assistance to the arbitral process, (iii) the convenience to the Parties and the Tribunal, (iv) the availability and costs of support services, and (v) neutrality.

30.   First, the Respondent submits that as the Claimant alleges treaty violations by Canada and specifically Ontario, the most relevant evidence is likely to be located in Canada. If a seat outside Canada is chosen, in order to procure relevant third-party evidence, this Tribunal may have to go through a "burdensome and time-consuming" letters rogatory process. The process could be rendered even lengthier if the third party opposes the letters rogatory.

31.   Second, according to the Respondent, the Claimant has not cited a single relevant judicial authority in support of its broad and (so it is said) inaccurate claims concerning US law. The US Supreme Court has rendered no decision so far on the scope of Section 7 of the FAA. Neither has the Eleventh Circuit (covering Miami) or the Ninth Circuit (covering San Francisco and Los Angeles) addressed the territorial and temporal limitations of Section 7 of the FAA.

32.   For the Respondent, evidence-gathering powers under the FAA are subject to significant territorial and temporal limitations. For instance, in *Dynegy*, the Second Circuit limited the territorial powers of a tribunal to issue subpoenas under Section 7 of the FAA. Further, in *Alliance Healthcare*, a district court held that the FAA's territorial restrictions cannot be avoided by the arbitral tribunal holding a hearing in the district where the evidence is located, as only a district court at the seat of the arbitration had the authority to enforce an arbitral subpoena. Moreover, in *Life Receivables*, the Second Circuit held that Section 7 was also temporally limited: tribunals were not allowed to order pre-hearing document production or testimony from third parties. Consequently, according to the Respondent, if this Tribunal were seated in New York, it could not assist in gathering evidence from third parties situated in other US jurisdictions. By contrast, choosing a seat in Canada would facilitate the gathering of evidence

8

from third parties if the evidence is located in Canada, and it would not inhibit the Tribunal's powers to assist in collecting evidence in the US.

33.  The Respondent denies the Claimant's assertion that if the Tribunal has its seat in the US, evidence can be obtained pursuant to Section 7 of the FAA as well as in accordance with Section 1782. It refers to case law and submits that this issue is not settled. By contrast, if the Tribunal is seated outside the US, it is undisputed that it could make use of Section 1782, which has the advantage of being neither territorially nor temporally restricted.

34.  Third, the Respondent argues that Toronto (where the Provincial Government whose measures are at issue is located) or Alberta (where the Claimant's alleged investments are incorporated) would be most convenient to the Parties and the Tribunal. Toronto is the place with the most significant connections to the subject matter of this dispute. In addition, the Claimant's counsel has its principal offices in Toronto and Canada's counsel is located nearby in Ottawa. The evidence related to the measures being challenged and the witnesses who could provide relevant testimony are all likely to be located in or close to Toronto. Toronto also has a well-connected international airport and offers top-notch facilities.

35.  Finally, the Respondent submits that the competent courts in Toronto are neutral in cases involving Canada as the respondent or requiring the consideration of measures of the Government of Ontario. In seven of the nine previous NAFTA Chapter 11 arbitrations against Canada where a tribunal selected the seat, it opted for a Canadian city. In the context of the recent challenge of the NAFTA award in *Cargill*,[7] the Ontario Court of Appeal stated that courts should interfere in arbitration "only sparingly or in extraordinary cases".

   3.  Analysis

36.  The Tribunal must determine the seat of this arbitration on the basis of Article 1130 of the NAFTA and of Article 16 of the 1976 UNCITRAL Rules. In relevant part, the former reads as follows:

> "Article 1130: Place of Arbitration
> Unless the disputing parties agree otherwise, a Tribunal shall hold an arbitration in the territory of a Party that is a party to the New York Convention, selected in accordance with:
> ...
> (b) the UNCITRAL Arbitration Rules if the arbitration is under those Rules."

---

[7] *Mexico v. Cargill Incorporated*, 2011 ONCA 622.

37.  Article 16 of the 1976 UNCITRAL Rules reads, in its relevant part, as follows:

> "PLACE OF ARBITRATION
>
> Article 16
>
> 1. Unless the parties have agreed upon the place where the arbitration is to be held, such place shall be determined by the arbitral tribunal, having regard to the circumstances of the arbitration.
>
> 2. The arbitral tribunal may determine the locale of the arbitration within the country agreed upon by the parties. It may hear witnesses and hold meetings for consultation among its members at any place it deems appropriate, having regard to the circumstances of the arbitration."

38.  The Parties have also referred to the UNCITRAL Notes. While the UNCITRAL Notes do not bind the Parties and the Tribunal, they are often referred to in international arbitration practice (at least in respect of the selection of the seat) and may thus provide helpful guidance. In pertinent part, Article 3(a) of the UNCITRAL Notes reads as follows:

> "3. Place of arbitration
>
> (a) Determination of the place of arbitration, if not already agreed upon by the parties
>
> […]
>
> 22. Various factual and legal factors influence the choice of the place of arbitration, and their relative importance varies from case to case. Among the more prominent factors are: (a) suitability of the law on arbitral procedure of the place of arbitration; (b) whether there is a multilateral or bilateral treaty on enforcement of arbitral awards between the State where the arbitration takes place and the State or States where the award may have to be enforced; (c) convenience of the parties and the arbitrators, including the travel distances; (d) availability and cost of support services needed; and (e) location of the subject‑matter in dispute and proximity of evidence."

39.  One must draw a distinction between the legal place or seat of the arbitration, and the geographical place of the hearings. On the one hand, Articles 1130 of the NAFTA and 16(1) of the UNCITRAL Rules refer to the seat of the arbitration, a legal concept which produces three legal consequences: (i) it determines the law that governs the arbitral proceedings; (ii) it confers jurisdiction upon the local courts of the seat in support and control of the arbitration; and (iii) it determines the "nationality" of the award for purposes of enforcement of the award. These

consequences apply in investor-state (with the exception of arbitrations conducted under the ICSID Convention) as well as in commercial arbitrations. On the other hand, Article 16(2) of the UNCITRAL Rules refers to the geographical place of hearings, which may be determined keeping in mind various practical factors, including the convenience of witnesses, parties and their legal representatives.

40.   With respect to the geographical place of hearings, pursuant to Article 16(2) of the UNCITRAL Rules, the Tribunal may hold hearings in different places taking account of the circumstances of the arbitration. This rule finds confirmation in paragraph 6 of PO 1, according to which "[t]he Tribunal may, in its discretion, convene hearings at any location other than the seat of arbitration and will decide on such location after hearing the Parties and taking into account all relevant circumstances." Irrespective of the Tribunal's determination of the legal seat of the arbitration, the Tribunal may therefore hold hearing(s) at any place it deems appropriate after consultation with the Parties. Given this discretion, the Tribunal considers that many of the practical / logistical factors urged by each party do not bear directly on the choice of legal seat (since they can be accommodated in any event by the Tribunal's discretion in selecting the geographical place of hearings).

41.   Turning now to the legal seat, the Claimant proposes a seat in the US and the Respondent a seat in Canada. Each Party names certain cities within these countries. The Tribunal will first select the country ((i)-(iii) below) and then the city ((iv) below).

42.   Pursuant to Article 1130 of the NAFTA, the Tribunal must choose a seat in Canada, the US or Mexico. None of the Parties has advocated Mexico. The Tribunal will thus limit its considerations to the US and Canada. In doing so, it will review the different factors on which the Parties rely and group them as follows: (i) proximity to the evidence, suitability of the procedural law governing the arbitration, and court assistance to the arbitral process, (ii) convenience and availability and costs of support services, and (iii) neutrality.

    (i)      Proximity to Evidence, suitability of procedural law, and court assistance

43.   The principal reason advanced by the Claimant for a US seat is that the arbitration would be subject to the FAA and that under Section 7 of that Act, the Tribunal would have the power to assist the Parties in obtaining evidence from third parties located in the US.

44.   The Tribunal makes no comment here on whether it would actually exercise the power conferred on it by Section 7. Rather, the relevant point at this stage is the potential for the Claimant to make such an application, if it considers this

appropriate. If the seat is in the US, the Claimant has the possibility to seek to compel evidence from third parties situated there. The same does not appear to be true, however, if the arbitration is seated in Canada. In other words, a decision at this stage to designate a Canadian seat would appear to entirely exclude this option. This possibility of facilitating the production of allegedly relevant and material evidence - whether or not it is in fact invoked, or permitted -  thus speaks in favor of a US seat, which would allow all procedural options to be kept open.

45. This is especially so as the Respondent has not asserted a need to compel evidence from third parties in Canada. Neither has the Respondent shown that it would be prejudiced by a US seat in terms of the factors analyzed here. Rather, it has submitted that, depending on the location of the seat in the US, there may be significant territorial and temporal limitations on the Tribunal's authority under Section 7 of the FAA. However, the Claimant itself has disputed this position. While it makes no assessment here on such limitations, the Tribunal notes that, should any such territorial or temporal limitations exist, any related detriment would fall exclusively on the Claimant, who chose to request a US seat. It is the Claimant that takes this risk.

46. The Tribunal also notes the Respondent's argument that with a seat in Canada the Tribunal could make use of Section 1782, while it is "at best uncertain" whether Section 1782 is available to a tribunal seated in the US. On the basis of the record as it stands and on a review of the authorities submitted, the Tribunal can reach no conclusion on the availability of Section 1782 proceedings if the seat is set in the US. This is in any event a conclusion for the courts to reach. But if Section 1782 were held inapplicable, any prejudice would again fall exclusively on the Claimant, who argued in favor of a seat in the US.

47. Beyond these considerations, both the US and Canada are first-rate arbitral seats. Both countries are supportive of arbitration, are Parties to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and have courts that are favourable to arbitration. An analysis of the procedural law governing arbitration, or *lex arbitri*, would therefore be inconclusive.

  (ii)  Convenience and availability and cost of support services

48. These factors have more to do with the geographical place of hearings than the legal seat of the arbitration. For the reasons given above, depending on the particular circumstances, the Tribunal may hold hearing(s) at any place it deems appropriate after consultation of the Parties. While some hearing places may obviously entail higher costs for one or the other Party, such cost issues can be dealt with at the stage of the cost allocation in the award.

49. This said, in determining the legal seat, neither of these factors tips the balance in one direction or the other. The particular cities indicated by the Parties are all easily accessible and have good hearing facilities.

      (iii)    Neutrality

50. Surprisingly, the UNCITRAL Notes do not list neutrality as a "prominent factor" in choosing the seat. In spite of this silence, the Tribunal considers that neutrality is an important element when deciding where to fix the seat. Often in international arbitration the seat is chosen not because of its connections with the dispute, but, on the contrary, for the lack of connections or, in other words, for its neutrality, offering both parties a level playing field.

51. In investment arbitrations under the NAFTA, such neutrality is difficult to achieve because of the requirement that the seat be located in a NAFTA State. It is thus generally not given much weight, if any. This is not a reason for a tribunal to be insensitive to the neutrality concern when a party raises it – as in this case. While it has full confidence in the professionalism of the courts in both Canada and the US, it is true that it makes less sense to entrust jurisdiction over the arbitration and the award to the courts of the State the measures of which are at issue in the proceedings rather than to the other state. Separating the reviewing court from the State whose actions are under review may better ensure a neutral procedural environment, or at least a procedural environment that is <u>perceived</u> as more neutral.

52. Based on the foregoing, and having carefully considered all factors, the Tribunal decides that the legal seat of this arbitration should be in the US. The Tribunal wishes to emphasize, once again, that this conclusion entails no pre-judgment whatsoever as to whether, in the event, any of the procedural mechanisms in the US for the gathering of evidence upon which the Claimant relied will actually be permitted in this case.

      (iv)    City

53. The Tribunal must next determine the location in the US which will be the seat of the arbitration. In its letter dated 26 October 2012, the Claimant proposed Miami, New York City, Washington, D.C., San Francisco or Los Angeles, indicating a preference for New York and Miami. The Respondent had the opportunity to comment on each of these proposals in its letter of 2 November 2012. However, it largely restricted its observations to the proposal of a seat in New York.

54. In light of the submissions of the Parties, the Tribunal finds it reasonable to discard a New York seat. Indeed, from the decision of the United States Court of Appeals for the Second Circuit in *Dynegy*, it appears that the power of arbitral

tribunals seated in New York to compel evidence under Section 7 of the FAA is subject to restrictions.

55.  Among the other proposals of the Claimant, the Tribunal believes that Miami, Florida is the most appropriate. According to the Claimant, "key evidence...is located within the State of Florida" (and hence the Claimant has already filed an application under Section 1782 before the United States District Court for the Southern District of Florida). Courts in Florida are considered to be supportive of international arbitration. Florida is an UNCITRAL Model Law jurisdiction and the legal framework applicable to international arbitrations is thus consistent with transnational standards. Further, in the absence of a decision of the United States Court of Appeals for the Eleventh Circuit, the decision in *Festus* lends credence to the view that United States District Courts within that Circuit may interpret Section 7 of the FAA to permit compulsion of evidence located in the United States for use in a US-seated arbitration without territorial or temporal limitations.   Having carefully considered all options, the Tribunal concludes that the appropriate seat for this arbitration is Miami, Florida.

### III.      SECTION 1782 REQUESTS

1.  The Respondent's Position

56.   In its letters of 5 October 2012, 9 November 2012, 27 November 2012 and
      26 February 2013 and at the Procedural Hearing, the Respondent made several
      requests concerning the Section 1782 documents. In sum, the Respondent
      requests the Tribunal to (i) grant the Respondent's challenge to the admissibility
      of the Section 1782 documents; (ii) if the Section 1782 documents are found to
      be admissible, confirm that the Tribunal's determination would not apply to any
      transcripts of witness testimony; (iii) confirm that further efforts by the Claimant to
      obtain evidence using Section 1782 should be pursued only under the
      supervision of the Tribunal; (iv) direct the Claimant to identify any Section 1782
      documents which are already in the record; and (v) strike those documents from
      the record.

57.   According to the Respondent, the Claimant initiated US court proceedings to
      collect evidence from third parties *ex parte*, circumventing the document
      production process in the arbitration, and undermining the authority of the
      Tribunal to govern its own procedure. Tribunals, such as the one in *Caratube*[8],
      have frowned on the use of such proceedings without authorization. Further, the
      IBA Rules on the Taking of Evidence in International Commercial Arbitration,
      2010 ("the IBA Rules") make clear that a disputing party must obtain the
      authorization of a tribunal prior to seeking the assistance of a domestic court to
      obtain third party evidence. The Respondent argues that it is for the Tribunal to
      determine if the Claimant should be permitted to gather evidence by recourse to
      a domestic court.

58.   The Respondent further asserts that the choice of a procedure other than that
      contained in the IBA Rules undermines the principles of fairness and equality of
      the Parties in a manner that is inconsistent with Article 15 of the UNCITRAL
      Rules. For example, and most importantly, the information collected by the
      Claimant apparently includes a transcript of a witness deposition. If such
      evidence were to be admitted, it would fundamentally prejudice the Respondent
      because the Respondent had no opportunity for cross-examination.

59.   For the Respondent, the Claimant should bear the consequences of not following
      the relevant procedures for the collection of evidence in this arbitration. The
      Claimant submitted its alleged Notice of Arbitration on 4 October 2011. This
      Tribunal was constituted eight months later on 29 June 2012. Instead of waiting
      for the authorization from the Tribunal to seek documents pursuant to the

---

[8] *Caratube International Oil Company LLP v. Republic of Kazakhstan* (ICSID Case No.
ARB/08112) Procedural Order No.3, 26 May 2010.

relevant IBA Rules, the Claimant made applications for judicial assistance to the US courts on 14 November 2011 and 1 December 2011. During this period, the Respondent was still requesting that the Claimant enter into consultations. In these circumstances, "the information gathered by the Claimant pursuant to U.S. law should not be admitted into this arbitration."

60.    Finally, the Respondent contends that rejecting the Section 1782 documents will cause no prejudice to the Claimant. To the extent that the materials obtained by the Claimant consist of communications between the Ontario Provincial Government and third-party FIT Program applicants, all of the documents obtained pursuant to Section 1782 will be equally available through the document production process of this arbitration.

### 2.    The Claimant's Position

61.    In its letters of 19 November 2012 and 27 February 2013 and at the Procedural Hearing, the Claimant opposed the Respondent's requests. According to the Claimant, the purpose of Section 1782 is to allow parties to international arbitrations to obtain evidence that may not be available otherwise. Canada's Section 1782 Requests contradict the purpose of that provision. For the Claimant, "all relevant evidence is admissible, unless privilege or some other exception applies." The Claimant also asserts that it would be appropriate for the Respondent to make submissions about the weight of the evidence after the evidence has been admitted, rather than before it is presented.

62.    The Claimant further contends that the deposition evidence should be treated no differently than documentary evidence. Depositions provide relevant information regarding the dispute and any confidentiality concern can be addressed by application of the Tribunal's Confidentiality Order.

### 3.    Analysis

63.    The principal submission of the Respondent is that the Tribunal should reject the Section 1782 documents, essentially because they have been procured without the authorization of the Tribunal through US court proceedings in which the Respondent was not involved. The Tribunal has sympathy with some of the Respondent's concerns, but is unable to agree with the position as it has articulated it here.

64.    First, it appears that at least some of the Claimant's Section 1782 applications preceded the constitution of the Tribunal on 29 June 2012. For instance, on 14 November 2011 and 1 December 2011, the Claimant filed Section 1782 applications in California and Florida. Thus, the situation is different from the one

in *Caratube,* where the claimant resorted to a Section 1782 application after the tribunal's constitution.

65. Second, the Tribunal does not believe that it should summarily reject – in advance of their filing – all the Section 1782 documents that the Claimant may one day submit, for the sole reason that they have been procured though court proceedings. Once the documents are before the Tribunal, the Respondent will be able to object to them on the basis of the IBA Rules on the Taking of Evidence or any other applicable rules of arbitral procedure. If Canada raises an objection, the Tribunal will then rule on the admissibility of the specific evidence at issue.

66. The same approach was adopted by the tribunal in *Caratube*. The tribunal did not pre-emptively reject all the documents that may later be introduced into the record on the ground that they had been obtained through Section 1782. Instead, the tribunal observed that "[s]hould Claimant, at a later stage of this arbitral procedure apply to admit any document produced in the Section 1782 procedure, this Tribunal will have to decide on such an application having regard to its obligation to accord procedural fairness to the Parties and particularly to Respondent's right to object and to reply to such a document."

67. Thus, the Tribunal considers it premature to deny the admissibility of all future Section 1782 evidence by anticipation. Similarly, Section 1782 documents that may currently be in the record cannot be struck in a wholesale exercise. This said, the Respondent may not be able to identify the Section 1782 documents that have already been filed or will be filed in the future. Therefore, the responsibility for identifying the Section 1782 evidence must lie with the Claimant. As a consequence, the Claimant shall identify the Section 1782 evidence already filed by no later than 8 April 2013. In the future, the first cover page of any Section 1782 evidence filed in these proceedings must be labelled "Section 1782 Evidence", or some variation thereof.

68. Finally, the Tribunal agrees with the Respondent's request that further efforts by the Claimant to obtain evidence on Section 1782 be pursued exclusively under the supervision of the Tribunal (request (iii) ¶56 above). It notes that the Claimant has not raised any specific objection to this request. To the knowledge of the Tribunal, the Claimant has initiated four court proceedings in the US aiming at gathering evidence for use in this arbitration. The Tribunal is unaware of other proceedings. As a consequence, the Tribunal expects the Claimant to report on the status of all the proceedings initiated in the US to obtain evidence in this arbitration on a regular basis, the first time on 1 month from the date of this Order, and thereafter every 3 months and upon the occurrence of any significant

17

event in any of the proceedings, such as the issuance of a decision.[9] In addition, if the Claimant wishes to initiate new proceedings for gathering evidence or to make new requests for further evidence in the existing proceedings, it shall seek the authorization of this Tribunal in advance.

## IV.    CONTINUATION OF BIFURCATION

69.    In their submissions of 3 December 2012 and 24 December 2012, both Parties expressed their views on bifurcation. In PO 2, the Tribunal bifurcated the proceedings between the Respondent's Article 1120(1) objection on the one hand, and all other jurisdictional and merits objections on the other. However, while doing so, the Tribunal expressly reserved the possibility that upon the review of further pleadings, it may discontinue the bifurcation:

> "However, [the Tribunal] cannot rule out that, after having reviewed the Claimant's Answer on Jurisdiction (on compliance with Article 1120(1) NAFTA) due on 18 February 2013 and the Reply and Rejoinder on the same issue, if any, it may find it preferable to re-join the objection in issue to the merits."

70.    At the telephone conference of 28 February 2013, upon the Tribunal's request, the Parties made submissions on the continuation of the bifurcation and further procedural steps. The Claimant emphasized that its defense to the Respondent's Article 1120(1) objection was closely linked with the merits of the case and indicated a preference for a second round of pleadings on jurisdiction. Given the factual nature of its submissions, such round would (so it was argued) necessarily have to be preceded by a document disclosure process. Further, a hearing on jurisdiction of approximately five days was said to be essential. In these circumstances, according to the Claimant, continuing with the bifurcation would be unnecessarily duplicative. The Claimant thus requested the Tribunal to discontinue the bifurcation.

71.    On the other hand, the Respondent submitted that the bifurcation should continue. It argued that the facts relevant to determine the Respondent's objection were distinct from those to be reviewed, if at all, at the merits stage. Even if the Tribunal assumed all the facts as alleged to be true, the Tribunal would still have to deny jurisdiction on the basis of Article 1120(1). In respect of the further procedure, the Respondent denied that any document disclosure was necessary at the present stage. It suggested that the Tribunal order another round of submissions on jurisdiction. If at all, a hearing on jurisdiction should not last more than one day.

---

[9] Towards this end, in its letter of 3 December 2012, the Tribunal advised the Claimant to inform the Tribunal of any developments concerning the Section 1782 application filed by it in the United States District Court for the District of New Jersey.

72.   The Tribunal recalls that Article 1120(1) of the NAFTA provides that a disputing investor may submit a claim to arbitration "provided that six months have elapsed since the events giving rise to the claim". The Respondent submits that the Claimant has submitted claims arising from events and measures that occurred within this six-month period. As the Claimant has not complied with the six-month period provided in Article 1120(1), the Tribunal lacks jurisdiction. By contrast, in its Answer on Jurisdiction, the Claimant identifies the measures falling within the six-month period and alleges that these measures are "directly connected" with earlier events, which fall outside the six-month period.

73.   Having now had the benefit of the Claimant's Answer on Jurisdiction, it appears to the Tribunal that it may not be possible to rule on the application of Article 1120(1) in the abstract, without substantially engaging in the facts of the dispute. The Tribunal will likely need to establish certain facts and the connections between these facts. Such an inquiry will best be conducted together with the merits phase, when the Tribunal will have the benefit of the entire record, including documents obtained through document production orders and witness evidence. It indeed anticipates at this stage that part of the facts, allegations, evidence, and arguments related to jurisdiction will overlap with the case on the merits.

74.   Should the Tribunal find that it has jurisdiction, a bifurcated process would be unnecessarily duplicative. If, by contrast, the Article 1120(1) objection is upheld, the Tribunal would either have jurisdiction over part of the claims or it would have no jurisdiction at all. In this latter case, it is true that the procedure chosen would turn out not to have been the most efficient possible. However, as matters stand now, the discontinuation of the bifurcation appears on balance and considering all the circumstances and different possible outcomes to be the most advisable solution.

75.   In addition, pursuant to PO 2, other jurisdictional objections (if any), will in any event be heard along with the merits. Moreover, should the Respondent's jurisdictional objections succeed, the Tribunal may take steps to accommodate the Respondent's costs.

76.   Finally, the Tribunal has also considered the Respondent's submission that even if the facts as stated by the Respondent are assumed to be true, the Tribunal would still have to deny jurisdiction on the basis of Article 1120(1). It has asked itself whether it could indeed rule on jurisdiction on assumed facts. It is, however, unable to do so. Unlike other types of preliminary ruling (e.g. a "strike out"), it cannot base its decision on jurisdiction on mere assumptions. A ruling on jurisdiction would be final and binding on the Parties and carry *res judicata* effect. The facts forming the basis of the Tribunal's jurisdiction must be proven. If they are not, jurisdiction is not established. It would be needlessly problematic and

unfortunate if facts assumed to be true for purposes of jurisdiction, were at a later stage found to be contrary to the record.

77.   For the foregoing reasons, the Tribunal will thus discontinue the bifurcation ordered in PO 2. The Respondent's Article 1120(1) jurisdictional objection will therefore be joined to the merits from now on. Accordingly, the arbitration will follow the calendar established in PO 1 for proceedings joining jurisdiction and merits, the dates being deferred, as reflected in Annex A of this order. By the same token, the Tribunal denies the Claimant's request to amend the sequence of the procedural steps established in PO 1 for the scenario of joint proceedings. It sees no reason to depart from the sequence adopted in the previous calendar.

78.   Annex A hereto is sent to the Parties in draft form. The time-limits and dates set out therein will become effective on 9 April 2013 unless either Party objects to a specific date (not to the sequence) no later than 8 April 2013, in which case the Tribunal may reconsider.

79.   Having decided to adopt this approach, the Tribunal can dispense with considering the Claimant's request of 22 February 2013 that it be permitted to file additional documents supporting its factual contentions in its Answer on Jurisdiction.

80.   Finally, the Tribunal notes that it is not called on to make any observation on the Amended NextEra Protective Order. In its letter of 22 February 2013, the Claimant submitted that it is now "in a position to present evidence from NextEra to the Tribunal under the terms of the Tribunal's [Confidentiality] Order." The Tribunal therefore understands that neither the Tribunal nor the Respondent would be bound by the terms of the Amended NextEra Protective Order; and that the Claimant is not seeking any amendment of the Tribunal's Confidentiality Order.

## V.   ORDER

81.   For the reasons set out above, the Tribunal:

   i.   Determines that the legal seat of the arbitration pursuant to Article 16(1) of the UNCITRAL Rules shall be Miami, Florida;

   ii.   Dismisses the Respondent's challenge to the admissibility of all Section 1782 documents, subject to later reconsideration of specific Section 1782 evidence;

iii.  Orders the Claimant to identify any Section 1782 documents which are already in the record by no later than 8 April 2013;

iv.  Orders the Claimant to identify any Section 1782 evidence to be filed later in these proceedings by marking the first page as "Section 1782 Evidence", or some variation thereof;

v.  Orders the Claimant to report on the status of the US court proceedings initiated to gather evidence for use in this arbitration on 29 April 2013 and thereafter every three months;

vi.  Orders the Claimant to seek prior authorization from this Tribunal if it intends to initiate any new Section 1782 proceedings or make any new requests in the existing proceedings;

vii.  Discontinues the bifurcation ordered in PO 2;

viii.  Orders the Parties to follow the calendar set forth in Annex A to this Order, unless either Party objects to any specific date by 8 April 2013;

ix.  Denies all other requests; and,

x.  Reserves costs for subsequent determination.


Date: 28 March 2013


For the Arbitral Tribunal

_____
Prof. Gabrielle Kaufmann-Kohler

**Annex A to PO 3**

Calendar

